779 F.2d 719
 121 L.R.R.M. (BNA) 2262, 250 U.S.App.D.C. 329
 AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, LOCAL 2544, Petitioner,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent,
U.S. Department of Justice, Immigration and Naturalization
Service, Intervenor.
 No. 84-1479.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 6, 1985.
Decided Dec. 24, 1985.
As Amended Feb. 14, 1986.
 
 Petition for Review of an Order of the Federal Labor Relations authority.
 Joe Goldberg, with whom Mark D. Roth was on the brief, for petitioner.
 Jill A. Griffin, Atty., Federal Labor Relations Authority, with whom Ruth E. Peters, Sol. and Steven H. Svartz, Deputy Sol., Federal Labor Relations Authority were on the brief, for respondent.
 William C. Owen, Atty., Dept. of Justice, with whom Richard K. Willard, Acting Asst. Atty. Gen., and William G. Kanter, Atty., Dept. of Justice were on the brief, for intervenor.
 Before WALD, EDWARDS and STARR, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 Dissenting opinion filed by Circuit Judge STARR.
 WALD, Circuit Judge:
 
 
 1
 The American Federation of Government Employees, Local 2544 challenges a decision of the Federal Labor Relations Authority (FLRA) dismissing an unfair labor practice complaint filed against the Immigration and Naturalization Service of the United States Department of Justice (INS). The FLRA ruled that the INS did not commit an unfair labor practice by conducting an investigatory interview of a bargaining unit employee after denying the employee's request for union representation at the interview.[1] We reverse because we do not find substantial evidence in the record to support the FLRA's conclusion that the employee could not reasonably believe that disciplinary action might result from the interview.
 
 I. BACKGROUND
 
 2
 This case grows out of an investigation of INS border patrol agents for alleged theft of a government vehicle along with drinking and illicit sexual activities at the Tucson Patrol Sector. The Office of Professional Responsibility (OPR), the internal investigative unit of INS, conducted the investigation from March through April of 1981 and sent four OPR investigators to the Tucson border patrol station to interview both suspects and witnesses to the incident.
 
 
 3
 On April 9, 1981, Patrol Agent Gregory Reed was told by his supervisor to report to sector headquarters to talk to the OPR representatives. Reed, who had been on duty the night of the alleged misconduct and knew of the ongoing OPR investigation, assumed that he would be questioned about the alleged misconduct of fellow agents. Reed also knew that under the Operations Instructions of the INS, border patrol agents were required to report immediately any acts of misconduct committed by other agents and that disciplinary action could be taken against any agent who failed to promptly report such misconduct. Reed had been advised of this obligation only three months earlier by his immediate supervisor, Deputy Chief Patrol Agent Edwin Barnette, at a station meeting attended by all patrol agents.
 
 
 4
 On his way to headquarters, Reed met Marvin Foust, the president of Local 2544 of the American Federation of Government Employees (AFGE). AFGE was the exclusive representative of the unit which included the Tucson border patrol agents. Reed asked Foust to represent him at the meeting with the OPR investigators. Foust accompanied Reed to sector headquarters where they met OPR investigators Anthony Medici and Patrick Comey. The OPR investigators inquired about Foust's presence, and Reed stated that Foust was his union representative.
 
 
 5
 The investigators told Reed they wished to take a statement from him as a witness to alleged misconduct by other agents. They informed Reed that he would be granted immunity from any disciplinary action based upon his statement. Medici and Comey also told Reed that in view of the grant of immunity, Reed would not be allowed to have a union representative at the interview. In support of this immunity, the OPR agents showed Reed a piece of paper stating:
 
 
 6
 No administrative proceedings will be instituted against you on the basis of any statement you make in the course of this interview. Therefore, any statement you make ... at this time relative to the aforementioned allegations of misconduct and the fruits thereof will not be used against you in any administrative proceeding initiated by the Service.
 
 
 7
 J.A. at 221. The paper bore no signature, J.A. at 59, and contained no citation of authority, J.A. at 60.[2]
 
 
 8
 Neither Reed nor Foust had previously heard about administrative immunity. Foust left to telephone the union's national vice-president for more information but was unable to reach him. Upon Foust's return, he attempted to accompany Reed into the investigation room but was told to leave. Reed again requested union representation; again the request was denied. The OPR investigators began to question Reed while Foust remained outside the interview room. Foust repeatedly but unsuccessfully attempted to enter the room, knocking at the door and shouting messages to Reed.[3] Foust then left the area to speak with Deputy Chief Patrol Agent Barnette, the agent normally in charge of disciplinary measures for the Tucson border patrol agents. Barnette told Foust that he, Barnette, was the disciplinary officer and that Medici and Comey, the OPR investigators, had no authority to grant administrative immunity.
 
 
 9
 Barnette and Foust then consulted with OPR Associate Deputy Director Howard Dobbs. Although not normally based in Tucson, Dobbs was temporarily at the station to assist in the investigation. Foust asked Dobbs to show him something in writing to support OPR's authority to grant administrative immunity. Dobbs showed Foust a statement setting forth the agency's position on the use of immunity contained in a response to an agenda item proposed by the union for discussion between AFGE and INS in future contract negotiations. Dobbs then went into the interviewing room and asked Reed if the immunity had been explained to him. Reed acknowledged that it had. Although Dobbs did not tell Foust so at the time, Dobbs also considered the immunity to be authorized by a 1979 memo to all OPR investigators from Paul Kirby, the Director of OPR (the Kirby Memorandum). This memorandum described a recent attempt by an unidentified OPR employee to grant "administrative 'use immunity' " where the grant of immunity was made solely in order to remove an employee's entitlement to a union representative. The Kirby Memorandum referred to this attempt as a "misuse" of employees' right to union representation.[4]
 
 
 10
 AFGE filed an unfair labor practice charge asserting that as the exclusive representative of the Tucson border patrol agents, it was entitled under Sec. 7114(a)(2)(B) of the Federal Service Labor-Management Relations Statute (FLMR)[5] to represent Reed at the interview. Section 7114(a)(2)(B) of the FLMR provides that an exclusive representative shall have the opportunity to be represented at
 
 
 11
 any examination of an employee in the unit by a representative of the agency in connection with an investigation if--
 
 
 12
 (i) the employee reasonably believes that the examination may result in disciplinary action against the employee; and(ii) the employee requests representation.
 
 
 13
 5 U.S.C. Sec. 7114(a)(2)(B).
 
 
 14
 The Administrative Law Judge (ALJ) concluded that AFGE had no right of representation under Sec. 7114(a)(2)(B) because the proffer of immunity to Reed relieved any reasonable fear of disciplinary action resulting from his statement. Although the ALJ found that Reed had made an effective request for union representation,[6] the ALJ was persuaded that, in this case, "it cannot be said that the 'risk of discipline reasonably inheres.' Inasmuch as the OPR agents specifically assured Reed that no administrative proceeding would be taken against him by reason of the interview, the employee had no basis to fear disciplinary conduct." 15 F.L.R.A. at 393 (footnote omitted).
 
 
 15
 The ALJ went on to address the General Counsel's contention that no legal support existed for the offer of immunity:
 
 
 16
 With respect to the argument that no statutory authority exists for the granting of immunity, I am persuaded that specific authorization, by way of statute or regulation, is not a requirement for the exercise thereof. The statutory provisions (8 USC 1103(a)(b) [sic] which sets [sic] forth the powers and duties of the Attorney General and the Commissioner of the Service include the power and right to control, direct and supervise employees in the Service. Moreover, he is authorized "to perform such acts as may be necessary for carrying out his authority" under the Statute. The right to grant immunity is necessarily implicit and inherent in the exercise of one's powers and duties on behalf of an agency. Further, the directive of June 26, 1979 by the OPR Director [the Kirby Memorandum] is, in my opinion sufficient authorization--and more than an opinion as asserted by General Counsel--for the action taken by the investigators. Since the granting of immunity to Reed, moreover, was approved and adopted by Respondent, I am satisfied that it was not illusory as maintained by General Counsel; that it was properly granted to the employee and binding upon the grantor.
 
 
 17
 15 F.L.R.A. at 394-95 (footnote omitted).
 
 
 18
 The FLRA adopted the ALJ's findings, conclusions and recommendations, and the union petitioned for review. We find that the FLRA's determination that Reed could not reasonably fear disciplinary action lacks substantial evidence in the record.[7] Accordingly, we reverse and remand the case to the FLRA to issue an order directing INS to cease and desist from its unfair labor practice.
 
 II. ANALYSIS
 A. The "Reasonably Believes" Standard
 
 19
 This case turns on the reasonableness of Reed's belief that the investigatory interview by OPR might result in disciplinary action against him. The ALJ found, and the FLRA affirmed, that Reed made an effective request for union representation. Therefore, under the statute, the union's right to represent Reed at the OPR interview depends solely on whether Reed reasonably feared disciplinary action.
 
 
 20
 The FLRA has consistently interpreted Sec. 7114(a)(2)(B) to say that a right to union representation exists whenever the circumstances surrounding an investigation make it reasonable for the employee to fear that his answers might lead to discipline. The possibility, rather than the inevitability, of future discipline determines the employee's right to union representation. See, e.g., Internal Revenue Service, Washington, D.C. v. Federal Labor Relations Authority, 671 F.2d 560 (D.C.Cir.1982), aff'g 4 F.L.R.A. 237 (1980) (risk of discipline even though employee interviewed was not the subject of the investigation). Thus, for example, a union has a right to represent an employee even if the employer does not contemplate taking any disciplinary action against the employee at the time of the interview, since disciplinary action will rarely be decided upon until after the results of the inquiry are known. See Department of the Navy, Norfolk Naval Base, Norfolk, Va. and Culp, 14 F.L.R.A. 731, 747 (1984).
 
 
 21
 The FLRA has also defined the "reasonably believes" requirement in Sec. 7114(a)(2)(B) as an objective standard. The relevant inquiry is whether, in light of the external evidence, a reasonable person would decide that disciplinary action might result from the examination. See, e.g., Internal Revenue Service, Washington, D.C. and National Treasury Employees Union, 4 F.L.R.A. 237, 251-52 (1980), aff'd sub nom. Internal Revenue Service, Washington, D.C. v. Federal Labor Relations Authority, 671 F.2d 560 (D.C.Cir.1982) (affirming ALJ's refusal to consider affidavit demonstrating that employee did not actually fear discipline). This objective standard was first set forth by the Supreme Court in NLRB v. J. Weingarten, Inc., 420 U.S. 251, 257 n. 5, 95 S.Ct. 959, 964 n. 5, 43 L.Ed.2d 171 (1975), in which the right to union representation at investigatory interviews was laid down for private sector employees. Section 7114(a)(2)(B), which extends Weingarten's protection to federal employees, has been similarly construed by the FLRA.
 
 
 22
 The FLRA's focus on the "objective facts relating to the interview of an employee," Department of the Navy, Norfolk, 14 F.L.R.A. at 745, while clearly excluding any consideration of an individual employee's subjective feelings, nonetheless appears to intertwine two distinct inquiries. The first inquiry looks to the conclusions that a hypothetical reasonable employee would draw from his own observation of the facts and circumstances surrounding the interview. See, e.g., Department of the Navy, Norfolk, 14 F.L.R.A. at 746 (looking to what an employee would perceive, experience and be aware of as support for a reasonable belief). The second inquiry equates the "reasonably believes" standard with the actual risk of discipline posed by the interview itself. As the FLRA explained in Internal Revenue Service, Washington, D.C., 4 F.L.R.A. at 252: " '[R]easonably believes,' in the context of [Weingarten ] [is] interchangeable with, and to be viewed from the perspective of, 'an investigatory interview in which the risk of discipline reasonably inheres.' " (quoting NLRB v. Weingarten, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975)).
 
 
 23
 The ALJ and the FLRA in the present case undertook both inquiries when evaluating whether AFGE had a statutory right to represent Reed at the OPR interview. Thus, the ALJ and the FLRA considered the effect of the grant of immunity on a reasonable employee but then went on to examine the validity of the immunity itself. While we have no quarrel with either prong of the FLRA's construction of the "reasonably believes" standard, we find the specific conclusions it draws under each prong to be without substantial evidence in the record.[8]
 
 B. The Evidence in the Record
 
 24
 1. The Effect of the "Immunity" Grant on a Reasonable Employee
 
 
 25
 In evaluating the effect of the facts and circumstances surrounding the interview on an employee's expectation of discipline, the ALJ and the FLRA concluded that the "grant of immunity" to Reed negated any reasonable fear of disciplinary action. While in some circumstances an express grant of immunity to an employee might well be expected to remove any fear of disciplinary action,[9] the facts in this record lead us to conclude otherwise, i.e., that the circumstances surrounding the purported grant of immunity here would not negate any reasonable apprehension of discipline. So long as a reasonable fear of disciplinary action remained, the union was entitled under Sec. 7114(a)(2)(B) to represent Reed at the investigatory interview.
 
 
 26
 The uncontradicted record shows that Reed could very reasonably have entertained doubts about the ability of the OPR agents to grant him administrative immunity. And absent immunity, Reed clearly could face disciplinary action, as he had apparently failed to promptly report the misconduct of other patrol agents as required by INS internal regulations. Since the FLRA has not argued that an employee may never question a grant of administrative immunity, the only issue before us is whether an employee in Reed's position might reasonably doubt the effectiveness of the alleged immunity grant to shield him from all possible disciplinary action.
 
 
 27
 We emphasize that all we are here called upon to decide is the effect of a purported grant of immunity on an employee's reasonable fear of disciplinary action; contrary to the dissent's allegation, we are not in any way evaluating the decision by INS not to enforce its disciplinary rules against Reed. We frankly do not even understand the argument of our dissenting colleague that such a decision is somehow inconsistent with Heckler v. Chaney, --- U.S. ----, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). Chaney limits not at all this court's power to examine the FLRA's conclusion that a reasonable employee under the circumstances of this case would not have feared discipline. When Congress enacted Sec. 7114(a)(2)(B), it created a statutory right to union representation whenever an employee "reasonably believes" he may be subject to discipline. Congress ordered the FLRA, and the appellate courts through their power of review, to enforce this provision of the FLMR. The dissent's reliance on Chaney and its statement that "the agency action here involved internal personnel policy, explicitly exempted from judicial review under the APA," Diss.Op. at 735, is virtually incomprehensible; it ignores entirely the specific protections surrounding the interrogation of employees enacted by Congress in the Civil Service Reform Act of 1978. The assessment of how the circumstances surrounding a purported grant of immunity would affect a reasonable employee is a far cry from dictating to an agency the manner in which it may grant immunity. Our determination that the evidence in this record does not support the FLRA's conclusion that Reed could not reasonably fear disciplinary action means only that in this investigatory interview Congress' statutorily guaranteed right to union representation applies. The dissent strangely and wrongly conflates our determination that under these peculiar facts Reed had a statutory right to union representation with a broadscale decision that the INS can never grant immunity to employees on a case-by-case basis.
 
 
 28
 We do indeed find in the record evidence of several circumstances that would make a reasonable employee continue to fear disciplinary action despite the "immunity" proffer. First, Reed had never heard of the immunity. Neither had Foust, the president of the union local representing all the Tucson border patrol agents. Even more critically, Deputy Chief Patrol Agent Barnette, the station officer normally charged with the responsibility of imposing discipline for misconduct by patrol agents, had no knowledge of any such procedure. In fact, Barnette specifically challenged the authority of Medici and Comey to grant immunity, noting that he was the disciplinary officer.[10] The ignorance of all three--employee, union representative and disciplinary officer--is understandable. There is absolutely no evidence in the record before this court that demonstrates that the grant of immunity was made pursuant to any formal INS policy or procedure for granting administrative use immunity. Likewise, as far as the record shows, this type of use immunity had not previously been granted to any INS employee at the Tucson station; it is thus reasonable that the employees had never heard of it.
 
 
 29
 Another factor to consider in evaluating the reasonableness of an employee's fear of discipline is the almost total absence of procedural regularity surrounding the purported grant of immunity to Reed. The question of whether any policy of granting immunity even existed will be treated below. But assuming, for purposes of the present discussion, that such a policy existed, the OPR agents in this case clearly were not following any standardized procedures for granting such immunity, but rather were acting in a slipshod and ad hoc fashion. This lack of procedural regularity is evidenced by the testimony of Dobbs recounting his assumptions about the origin of the grant of immunity offered to Reed. Dobbs testified that he based his action in granting immunity solely on the Kirby Memorandum and on the bargaining agenda item. Dobbs also testified that he was not aware of any statutory or administrative regulation giving him the right to grant such immunity. J.A. at 86. Investigator Medici testified to the same effect, but added that he also relied on an analogy to criminal use immunity. Dobbs and Medici thus admit that in granting immunity to Reed, they were not acting in accordance with any procedures at all.
 
 
 30
 The record provides additional circumstances supporting the reasonableness of Reed's concerns about the immunity. There had apparently been no INS attempt to inform employees or supervisors in advance of any policy of granting administrative immunity. And indeed when the OPR agents did attempt to offer immunity to Reed, they gave a totally inadequate explanation of its scope and effect. Since there was no ascertainable policy for granting immunity, Reed had no way of knowing whether OPR was acting in conformity with its own or INS procedures, and thus he did not act unreasonably in continuing to fear disciplinary action despite the purported immunity grant. We find it unrealistic if not incredible that a seasoned employee encountering a previously unannounced policy of administrative immunity for the first time--especially in an investigative setting--and knowing nothing about the power of his interrogators to grant immunity other than what they told him, should be asked nonetheless to accept their word and proceed to "incriminate" himself. He would, in our view, have every reason to question not just the validity of their grant but its scope as well--to doubt whether, for example, the immunity would apply to discipline emanating from the line deputy chief patrol agent who might independently learn of the employee's malfeasance or even undertake an investigation as a result of the employee's statements.
 
 
 31
 These substantial considerations militating toward a reasonable apprehension of discipline on Reed's part are purportedly balanced by the fact that the OPR investigators told Reed that he was only a witness and not the subject of an investigation. But in a prior case the FLRA has itself ruled that this circumstance alone does not provide sufficient evidence to support a finding that an employee would not reasonably fear disciplinary action. See Internal Revenue Service, Washington, D.C. and National Treasury Employees Union, 4 F.L.R.A. 237 (1980), aff'd, 671 F.2d 560 (D.C.Cir.1982). We consequently conclude that the FLRA's determination that the "grant of immunity" would remove any reasonable apprehension of discipline lacks substantial evidence in the record.
 
 
 32
 The dissent mistakenly suggests that we are deciding that it is "unreasonable for INS to grant administrative immunity in ad hoc fashion." Diss.Opp. at 735. This is not so. We decide only that formality and regularized procedures are relevant factors in assessing the effect of a grant of immunity on an employee's fears. When an agency-employer chooses to confer immunity on an ad hoc basis without any formal policy or procedure, it does indeed run a "risk" that an employee may reasonably fear disciplinary action, and consequently invoke a statutory right to the presence of a union representative at an investigatory interview. We do not, however, decide that this formality factor alone will always be dispositive on the issue of reasonable belief. In the present case, Reed's undisputed lack of any prior knowledge about immunity, the evidence of confusion between different arms of management over the existence and scope of the immunity, and the total lack of any evidence of the source of the immunity in the record combined to require reversal of the FLRA's conclusion as lacking substantial evidence. The dissent's position seems to require that whenever an employee is taken into a room by two unfamiliar investigators and told that he has "immunity," the employee must believe them and forfeit his right to union representation.
 
 
 33
 The dissent ignores the evidence in the record and instead assumes that "[a]n INS employee who reasonably knows that management could discipline him could not ... reasonably doubt the power of management to grant him administrative immunity." Diss.Op. at 733-34. But even if the FLRA had advanced such an assumption (which we do not think it did), it would still not carry the day in the present case. First, it ignores the issue of whether an employee must always believe what he is told. Second, Reed was confronted not with a unitary entity identified as "management" but rather with two separate, co-equal offices within management--OPR and the Regional Commissioner, as represented by the deputy chief patrol agent. For the FLRA to conclude that Reed was obligated to believe that OPR spoke for the deputy chief patrol agent when the deputy chief patrol agent denied OPR's authority to immunize would be a patently unreasonable conclusion on this record. The OPR agents never attempted specifically to explain to Reed that the immunity would, in fact, protect him from Barnette and the agents had no apparent authority to speak for Barnette.
 
 
 34
 Thus, the dissent's assumption ignores the squeeze play in which Reed was caught between separate offices within "management." Under the Operations Instructions of the INS, each managerial entity was charged with primary responsibility for administering different types of disciplinary infractions. While serious violations such as those involved in the Tucson investigation may have been primarily the responsibility of OPR, the Operations Instructions vested the Regional Commissioner and his agent, the deputy chief patrol agent, with primary responsibility for violations of the duty to report the misconduct of fellow agents. Contrary to the inference drawn by the dissent from Dobbs' position as Associate Deputy Director of OPR, there is no evidence in the record that the independent judgment of the deputy chief patrol agent with regard to disciplinary matters would be restricted by OPR. Reed could not be assured that the OPR report forwarded to the deputy chief patrol agent would not indirectly implicate him. If OPR recommended disciplinary action against other agents for drinking and sexual misconduct, the deputy chief patrol agent might easily conclude that Reed must have violated his obligation to report misconduct of fellow officers since Reed had been on duty with those officers.
 
 2. Validity of the Immunity
 
 35
 Both the ALJ initially and the FLRA on appeal addressed the authority of the OPR officials to grant immunity to Reed, obviously deeming it relevant to the inquiry as to whether Reed reasonably feared discipline under Sec. 7114(a)(2)(B). We do not suggest the FLRA would or must find this issue relevant under all circumstances. In this case, however, AFGE had introduced evidence that the supervisor who would normally impose discipline on Reed-- i.e., the deputy chief patrol agent--had specifically denied the authority of OPR to issue a blanket administrative immunity. The legitimacy of the immunity grant[11] was therefore an appropriate issue for the ALJ and the FLRA to address.[12] We find, however, that the FLRA's conclusion that the immunity was sufficiently authorized to be unsupported by substantial evidence on this record.
 
 
 36
 The FLRA's discussion does not address the central thrust of the deputy chief patrol agent's statement that the OPR officials could not grant administrative immunity. Dobbs and Medici testified that they considered the grant of immunity authorized by the Kirby Memorandum and the bargaining agenda item. Dobbs testified that he knew of no other statutory or administrative regulation giving him power to grant administrative immunity. At the hearing before the ALJ, the INS introduced no other evidence bearing on the power of OPR to confer administrative immunity binding on the deputy chief patrol agent, the line supervisor in charge of discipline.[13] We can find no legal basis to credit the FLRA's conclusion that the Kirby Memorandum provided sufficient authority for the grant of administrative immunity. The Kirby Memorandum merely describes a specific incident involving a grant of administrative immunity as a potential "misuse" of Weingarten rights. At most it amounts to secondary evidence suggesting that at some time there may have been some extant mechanism or practice of granting immunity by some INS officials. The Kirby Memorandum, by itself, is insufficient evidence of the existence of any policy of conferring immunity, let alone its details. Indeed, its description of the incident as a "misuse" suggests caution in applying any inchoate INS or OPR policy of administrative immunity.
 
 
 37
 The bargaining agenda item relied on by Dobbs is equally inadequate as authority for granting administrative immunity. The agenda item was obviously a proposal, not yet even adopted into a binding contract, with no authoritative power of its own. At most it represented the agency's interpretation of the current contract offered during the course of an adversarial negotiation procedure. Even this interpretation of the agenda item is probably generous, since the terms of the contract then in effect contain absolutely no provisions resembling those suggested by INS.
 
 
 38
 In addition to relying on the Kirby Memorandum, the FLRA also finds support for the validity of the immunity in 8 U.S.C. Sec. 1103 which sets forth the general powers of the Commissioner of INS. While we agree with the FLRA and the dissent that the Commissioner of INS probably does have inherent power to grant administrative immunity, there is no evidence in this record that the Commissioner has ever opted to utilize this power, that the Commissioner has delegated this power to OPR, or that OPR has an established or traditional policy for utilizing that power. Dobbs certainly did not rely on any inherent power of the Commissioner here; he instead cited to alleged authority in plainly untenable sources.
 
 
 39
 The core problem with the FLRA's reliance on the Commissioner's inherent power to grant use immunity is that we do not know from this record that the Commissioner delegated to OPR the exclusive power to conduct disciplinary actions. The evidence, in fact, is to the contrary. Disciplinary measures were generally invoked by the deputy chief patrol agent at the sector level; hence, it is he whom an employee might logically expect to hold the power to immunize. See 15 F.L.R.A. at 387 (ALJ's findings of fact). There is also no clue as to the scope of the immunity power the Commissioner might have delegated. The statements made by Reed, which demonstrated a failure to promptly report the misconduct of other employees, might well come to the attention of disciplinary officials outside of OPR, such as Deputy Chief Patrol Agent Barnette. Even if Dobbs had authority to bind OPR, there is no showing that he could restrain Barnette.
 
 
 40
 The FLRA also relies mistakenly on the fact that no disciplinary action has ever been instituted against Reed. This, of course, does not prove that such an action could not have been brought. Moreover, reliance on such post hoc evidence is contrary to the FLRA's own interpretation of Sec. 7114(a)(2)(B) that an employee is entitled to union representation where there is a risk at the time of the interrogation that the employee may later be subject to discipline.
 
 
 41
 To sum up, Dobbs' reliance on the Kirby Memorandum and the bargaining agenda item as a source of authority to grant immunity was patently in error. In light of this error, and of the lack of any other evidence in the record of any official policy or procedure for granting adequate immunity, we cannot find that the purported grant of immunity eliminated any reasonable fear of disciplinary action. Where the chief disciplinary officer at the station denies the power of OPR to grant immunity, and where there is no discoverable evidence in the record of any official policy of granting immunity, and where the individuals conferring the "immunity" cite as their authority materials which are completely inadequate to establish the existence of such a policy, the FLRA's conclusion that the purported grant of immunity negated any risk of discipline that reasonably inhered in the interview is not supported by substantial evidence.
 
 C. Estoppel
 
 42
 Even if the immunity conferred upon Reed turns out in fact to sufficiently protect him from any disciplinary action, that circumstance alone does not alter our conclusion. Because the focus of Sec. 7114(a)(2)(B) is on the risk of discipline at the time of an investigatory interview, we need not address the argument that the purported grant of immunity could be enforced on estoppel grounds. A violation of Sec. 7114(a)(2)(B) does not turn on equitable considerations that might intervene to shield an employee from the unfairness resulting from a strict application of the law. Reliance on the doctrine of estoppel, in fact, is itself a concession that a violation of Sec. 7114(a)(2)(B) occurred at the time of the interview. Moreover, even if the employee were to succeed on an estoppel claim, this would not restore to the union its right under Sec. 7114(a)(2)(B) to be present at an interview " 'in which the risk of discipline reasonably inheres.' " Internal Revenue Service, Washington, D.C., 4 F.L.R.A. at 252 (quoting Weingarten, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171). Finally, given the present legal uncertainty over whether estoppel can ever be pleaded against the government, see, e.g., Heckler v. Community Health Services, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); National Juvenile Law Center, Inc. v. Regnery, 738 F.2d 455, 466-67 (D.C.Cir.1984), we think it unfair to make the duped employee bear the risk that an estoppel argument would subsequently be decided in his favor.III. CONCLUSION
 
 
 43
 In concluding, we emphasize that the only thing we decide today is that in the totality of circumstances presented by this record, this employee could reasonably have feared discipline. The dissent's global fears about the impact of the decision on INS practices or on future interpretations of Sec. 7114(a)(2)(B) are altogether baseless. The FLRA's determination that Reed could not reasonably fear disciplinary action is contradicted by the evidence in the record. We reverse the FLRA's decision to dismiss AFGE's unfair labor practice complaint and remand to the FLRA so that it may issue an appropriate order directing the Immigration and Naturalization Service to cease and desist from its unfair labor practice.
 
 
 44
 Reversed and Remanded.
 
 STARR, Circuit Judge, dissenting:
 
 45
 Today's decision, with all respect, is at odds with fundamental principles of law which govern the sensitive relationship between the Article II and Article III branches of the National government. I am constrained, for the reasons which follow, to register my dissent.
 
 
 46
 * Confronted with a well-publicized scandal[1] over alleged on-the-job misconduct by a number of Border Patrol agents stationed in Arizona, the INS Commissioner instructed the agency's Office of Professional Responsibility (OPR), based in Washington, D.C., to complete an inquiry into the charges "as soon as possible." J.A. at 79. High-level representatives of INS, including the top OPR official on the West Coast and four OPR investigators, thereupon descended on Tucson to get to the bottom of what had occurred. During the large-scale inquiry that followed, OPR investigators interviewed seven Border Patrol agents suspected of misconduct; all seven were allowed to have union representation at the interview.
 
 
 47
 In the event which generated this case, OPR also interviewed Border Patrol Agent Gregory Reed, who was not a suspect and who was not allowed union representation. At the beginning of that interview, Agent Reed expressed fear that his answers might lead to disciplinary action against him and that he should, therefore, be afforded union representation. The OPR investigators thereupon read into the transcribed record of the interview the promise that Reed's statements would not be used against him in any disciplinary proceeding. True to that promise (and more), the INS never took any disciplinary action against Reed.
 
 
 48
 Thereafter, Local 2544 of the AFGE filed an unfair labor practice charge asserting a violation of the union's statutory right to represent Reed at the interview. See 5 U.S.C. Sec. 7114(a)(2)(B) (1982). In considering that charge, the FLRA expressly adhered to its settled view that Sec. 7114(a)(2)(B)(i) applies only when "in light of [the] external evidence a reasonable person would decide that disciplinary action might result from the examination." J.A. 259.[2] The FLRA concluded that a reasonable employee in Reed's position would not have feared disciplinary action after receiving a clear and express grant of immunity from OPR investigators who were undisputedly acting on behalf of the INS. J.A. at 259-260.[3] In so concluding, the agency directly confronted the General Counsel's primary contention, namely that a grant of immunity could never dispel a reasonable employee's fear of discipline. J.A. at 258, 261. The FLRA flatly rejected this extraordinary argument as premised on an inapt analogy to a prior case holding that an employee who waived his Miranda rights did not thereby waive his right to union representation. Id. at 261. The only other issue even raised by the General Counsel before the FLRA was the purported lack of express statutory or regulatory authority for INS's grant of immunity. Id. That argument was roundly dismissed on the ground that this sort of authorization was simply unnecessary. Id.
 
 
 49
 On appeal, the AFGE left lying in the dust the General Counsel's bizarre argument that an employer's grant of immunity can never serve as a defense to a charged violation of a union's statutory right to represent an employee during an interview. See Brief for Petitioner at 23. Nor did AFGE advance the argument that the OPR investigators lacked apparently authority to grant immunity. See id. at 24 (expressly contending that the issue of apparent authority was irrelevant to this case). Instead, the AFGE founded its appeal on the novel legal theory that under estoppel doctrine a government employee must be shown proof of management officials' actual authority to grant immunity before he or she can lawfully be interviewed without union representation. Id. at 24-29; Reply Brief for Petitioner at 3.
 
 
 50
 Although the court finds no error in the legal principles followed by the FLRA, it nevertheless reverses the agency on the asserted ground of a lack of substantial evidence in the record, despite the undisputed evidence of a clear and express grant of immunity. The court justifies its remarkable decision on the ground that the record contains "evidence of several circumstances that would make a reasonable employee continue to fear disciplinary action despite the 'immunity' proffer." At 725. Having identified evidence opposed to the FLRA's decision, the court facilely concludes that reversal is required without even examining the evidence favorable to the FLRA's decision.[4] This approach, with all respect, turns the substantial evidence rule on its head. Contrary evidence requires reversal only when the court "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).
 
 
 51
 The court's cavalier disregard for the abundant evidence supporting the FLRA's decision is manifest. For example, the court asserts that it could affirm only by adopting the extreme position "that whenever an employee is taken into a room by two unfamiliar individuals and told that he has 'immunity,' the employee must believe them and forfeit his right to union representation." At 727. This is a truly extraordinary proposition given the undisputed facts before us. Agent Reed fully well knew that he was not confronting faceless gnomes from the bowels of some distant, unknown bureaucracy. Far from it. It is undisputed that Reed had been ordered by his supervisor to report to sector headquarters to talk to the OPR representatives; thus, to put it gently, Reed could reasonably have been expected to know that the "two unfamiliar ... interrogators," At 727, were OPR representatives acting on behalf of the INS, not imposters. The court also turns its face from the undisputed fact that the grant of immunity was not mumbled in passing; rather, it was formally read into the taped record of the interview and duly recorded.
 
 
 52
 Most important, the court neglects to consider evidence in the record (and readily available information from the public record) demonstrating that a reasonable INS employee in Reed's position would have known that the OPR interviewers were acting on behalf of the highest level of INS management. In my judgment, any reasonable INS employee would know that OPR was and is one of only a handful of INS offices reporting directly to the Commissioner himself. See J.A. at 254; 1981 INS Ann.Rep. vii; cf. 8 C.F.R. Sec. 100.2(a) (1985); C. GORDON & H. ROSENFIELD, IMMIGRATION LAW AND PROCEDURE 1-46 (1985). Reed could also have been expected to know that OPR investigates only the more serious allegations of internal misconduct such as "civil rights violations," whereas "[a]llegations of a less serious nature are referred to INS regional offices for investigation and appropriate action." 1981 INS Ann.Rep. at 2-3; see J.A. at 190-191 (INS Operations Instructions). In fact, Agents Reed and Foust both testified that it was quite rare for INS to have an OPR investigator (as opposed to some relatively low-level, non-OPR agency employee) personally conduct an internal investigation at the Tucson station. See J.A. at 21-22, 53. The record further reveals that it was unprecedented for such a large group of OPR investigators to swarm upon Tucson. Id. at 22.
 
 
 53
 Given the manifest importance of this investigation to the Commissioner of INS, see supra page 1 and note 1, the apparent authority of OPR to represent the Commissioner himself in conducting the investigation, and the clear, express and memorialized grant of immunity made by OPR to Agent Reed, the record plainly contains substantial evidence to support the conclusion that a reasonable employee in Reed's position would not have doubted the validity of his immunity. And nothing more is needed to sustain the agency's result here. The FLRA need not measure the "reasonable person" standard by reference to some modern-day Doubting Thomas, skeptical and suspicious of the exercise of authority by management as to a matter falling plainly within management's legitimate interests and concern.
 
 
 54
 The contrary evidence cited by the court falls far short of "clearly preclud[ing]" the FLRA's interpretation of the record. Universal Camera, supra, 340 U.S. at 490, 71 S.Ct. at 465. The court points primarily to the fact that after union representative Foust left the area where Reed was being interviewed, Deputy Chief Patrol Agent Barnette opined to Foust that OPR lacked authority to grant administrative immunity. It is undisputed that Agent Reed did not even hear Barnette's ill-founded statement, if at all, until after the interview. Because the focus of Sec. 7114(a)(2)(B) is on the risk of discipline reasonably perceived by the employee at the time of the investigatory interview, the court's reliance on Barnette's statement is quite misguided. See at 729 (recognizing that events subsequent to INS's interview of Reed have no bearing on issue of whether Sec. 7114(a)(2)(B) was violated in this case).
 
 
 55
 Even if Deputy Barnette's odd statement were relevant, which it is not, that statement scarcely compels the conclusion that Reed would have reasonably feared that Deputy Barnette could override an OPR decision to grant immunity. An INS officer charged with the weighty responsibility of enforcing this Nation's immigration laws could certainly be expected to know that OPR's level in the INS hierarchy was considerably higher than that of a local Deputy Chief Patrol Agent. As I alluded to before, the head of OPR is one of a handful of individuals on the INS Commissioner's "immediate staff." 1 C. GORDON & H. ROSENFIELD, supra, at 1-44; see J.A. at 254; 1981 INS Ann.Rep. vii. On the other hand, a Deputy Chief Patrol Agent is at least five levels removed from the top of the INS management ladder. See 8 C.F.R. Sec. 100.2 (1983); 1981 INS Ann.Rep. vii; 1 C. GORDON & H. ROSENFIELD, supra, at 1-44. That is a long, long way from parity with OPR. Thus, the court errs in asserting without support--and indeed in contravention of elementary organizational facts--that OPR and the Deputy Chief Patrol Agent represent "co-equal offices within management." At 727.
 
 
 56
 The record likewise provides no basis for the court's implausible assumption that INS vests an humble Deputy Chief Patrol Agent situated out in the provinces with authority to override a grant of immunity by OPR. When the FLRA casually observed that "[d]isciplinary measures are determined by the Deputy Chief Patrol Agent," J.A. at 254, it was doing nothing more than noting the fact that INS disciplinary measures are imposed at the local level. See J.A. at 19, 55, 85. Of course, I would assume the obvious, that just as in most organizations, neither the Commissioner of INS nor the Director of OPR would personally fire or suspend insubordinate INS employees far down the hierarchial ladder. Unsurprisingly, the record contains no evidence supporting the far-fetched proposition that a Deputy Chief Patrol Agent out at some frontier outpost could veto discipline decisions made by high-level INS management. If that is so, the INS is, shall we say, wildly egalitarian in a manner previously unknown in the annals of public administration.
 
 II
 
 57
 The court, with all respect, likewise strays beyond permissible bounds of legitimate judicial review when it construes the language of Sec. 7114(a)(2)(B)(i) in disregard of the settled interpretation embraced by the FLRA and previously upheld by this court. See AFGE v. FLRA, 778 F.2d 850, 856, 861 (D.C.Cir.1985); Department of Defense, Army-Air Force Exchange Service v. FLRA, 659 F.2d 1140, 1162 n. 121 (D.C.Cir.1981) ("If the FLRA's construction of the statute is reasonably defensible, we are not free to reject it merely because we might decide differently...."), cert. denied, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982). See generally Chevron, USA, Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 794 (1984). Although the FLRA has faithfully adhered to that test in the past and expressly followed it in this case as well, the court deems it appropriate to construct a second test that, as best as I can understand it, evaluates the risk of discipline from the perspective of the omniscient employee at the time of the interview. At 724-25, 727-29. While conceding that the FLRA's opinion never clearly articulates this test, the court maintains that the FLRA implicitly applied this extraordinary standard when it considered the issue of whether statutory or regulatory authority existed to legitimate the grant of immunity. Id. at 724-25 & n. 8.
 
 
 58
 A court more inclined to the sound principle that "the interpretation of the FLMR rests in the first instance with the FLRA," id. at 724 n. 8, would be less ready to reach the conclusion that the FLRA's discussion of the issue of statutory authorization, raised in the first instance by the General Counsel, was irreconcilable with the FLRA's settled interpretation of Sec. 7114(a)(2)(B)(i). A more deferential--and more plausible--view is that the FLRA was, rather, responding to the possible argument that an employee in Agent Reed's position could reasonably doubt whether the INS generally had power to grant administrative immunity. Cf. J.A. at 59 ("Mr. Foust [the union local president] and I had never heard of [administrative immunity.]") (statement of Agent Reed); id. at 28 ("I was completely unfamiliar with the right of management to afford a person administrative immunity.") (statement of Mr. Foust).
 
 
 59
 Analyzing the issue of INS's actual authority to grant immunity in light of the FLRA's settled construction of Sec. 7114(a)(2)(B)(i), I would sustain the FLRA's conclusion that "[t]he right to grant immunity is necessarily implicit and inherent" in the INS's undisputed power to supervise its own employees. J.A. at 261. See also 8 U.S.C. Sec. 1103 (1982). The power to supervise obviously encompasses both the power to discipline and the power not to discipline. An INS employee who reasonably knows that management could discipline him could not, therefore, reasonably doubt the power of management to grant him administrative immunity.
 
 
 60
 Fearful that the FLRA's settled interpretation of Sec. 7114(a)(2)(B)(i) would fail adequately to protect federal employees "when the agency employer has convincingly lied or misstated the fact of immunity in order to dupe the employee into a false sense of security," Maj.Op. at 19 n. 12, the court addresses the issue whether the OPR officials were, in fact, vested with authority to grant Agent Reed immunity. In doing so, the court, first, denies the FLRA the opportunity to address this alleged problem of statutory construction and, second, ignores the fact that not a shred of evidence is to be found in this record that INS was trying to trick or dupe Reed by granting him administrative immunity. Agent Reed's unwarranted dyspepsia in Tucson scarcely provides a fitting occasion for laying down sweeping rules to vouchsafe rights which the court deems threatened in the abstract.
 
 
 61
 Even if the issue of the validity of the immunity conferred on Agent Reed were appropriately before this court, I would uphold the FLRA's decision. The record reveals that Mr. Dobbs, the INS official who had responsibility for all of OPR's West Coast operations and who reported directly to the head of OPR,[5] personally supervised the investigation on the scene and personally authorized the OPR investigators to grant immunity to Reed. J.A. at 79-80. The court, however, does not even consider the possibility that Mr. Dobbs' high-level position is substantial evidence of his authority to grant immunity on behalf of the INS.[6] At 728. This, with all respect, is quite wrong.
 
 
 62
 It cannot reasonably be concluded that INS's practice of granting immunity was unlawful absent a formal delegation of authority from the Commissioner. It has been so well-established in our law so as not--until today--even seriously to be questioned that practices concerning internal agency matters (such as the conduct and duties of employees) may lawfully develop as a matter of department custom and "need not be promulgated in any set form, nor in writing." Haas v. Henkel, 216 U.S. 462, 480, 30 S.Ct. 249, 254, 54 L.Ed. 569 (1910); see also United States v. Macdaniel, 32 U.S. (7 Pet.) 1, 13-14, 8 L.Ed. 587 (1833) ("To attempt to regulate, by law, the minute movements of every part of the complicated machinery of government, would evince a most unpardonable ignorance on the subject.... Hence, of necessity, usages have been established in every department of the government, which have become a kind of common law, and regulate the rights and duties of those who act within their respective limits."). Against this formidable backdrop of venerable learning, the court is forced to concede that this record contains substantial evidence of an established INS practice of granting administrative immunity. At 728; see also J.A. at 76-78, 228.
 
 III
 
 63
 Perhaps uncomfortable with grounding its decision on the irrelevant testimony of Deputy Barnette and a novel interpretation of Sec. 7114(a)(2)(B)(i), the court also holds that "[w]hen an agency-employer chooses to confer immunity on an ad hoc basis without any formal policy or procedure, it does indeed run a 'risk' that an employee may reasonably fear disciplinary action." At 727. But as we have seen, the grant of immunity in this case was made by high-level INS representatives during the course of an "extremely serious" OPR investigation and in a highly formalized setting. J.A. at 23 (testimony of union representative Foust). Thus, the court's concern with the lack of a general INS immunity policy has nothing to do with the issue whether INS's interview of Reed violated AFGE's statutory right to representation. Nor does the court identify any other federal statute or regulation that even arguably requires the INS to follow a formal policy or procedure when it decides not to institute disciplinary action against one of its own employees for possible misconduct. By requiring, in practical effect, an agency to follow judicially-imposed guidelines before it may question one of its own employees, the court strays into expressly forbidden terrain, for the judiciary is plainly wanting in power to impose procedural requirements with respect to an agency decision not to enforce an internal personnel rule.
 
 
 64
 Just last Term the Supreme Court reminded us "that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." Heckler v. Chaney, --- U.S. ----, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985) (citations omitted). In Chaney, the Court identified several reasons why it is for Congress and not the judiciary to establish guidelines, if any, that agencies must follow when they decide not to prosecute or enforce. First, an agency's exercise of its enforcement powers often requires a complicated balancing of agency priorities, a balancing that courts are ill-suited to second-guess. Second, when an agency decides not to exercise its coercive powers over an individual, less need exists for judicial oversight to protect individual rights. Finally, an agency's declination to take disciplinary action resembles a prosecutor's decision not to indict--a decision long regarded as immune from judicial review. Id.
 
 
 65
 Today's holding--that it is unreasonable for INS to grant administrative immunity in an ad hoc fashion--is utterly inconsistent with Chaney. The INS is manifestly better-equipped than the least dangerous branch to decide whether its management would be better served by a formulated policy of immunity made known to all employees (as this court would have it) or by a less formal approach tailored to the individual circumstances of each internal investigation (as the INS would have it). Moreover, it is unnecessary for this court to reach out to protect INS employees against arbitrary agency decisions not to prosecute them for job misconduct for the obvious reason that the INS's grant of administrative immunity does not infringe on the rights of any INS employees. Cf. Morton v. Ruiz, 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974) (suggesting that when agency action will "affect substantial individual rights and obligations" it may be improper for the agency to proceed on an ad hoc basis).
 
 
 66
 The interference wrought by today's decision with INS's case-by-case approach (or, as the majority would style it, the agency's ad hoc approach) to granting administrative immunity is, to be sure, different from the judicial interference struck down in Chaney. But the difference is singularly unhelpful in that the court's interference here is even more questionable than the judicial intrusion unanimously invalidated by the Supreme Court in Chaney. There, the FDA had refused to take action in regard to an asserted public health problem (albeit, to be sure, in rather unorthodox circumstances); here, the INS has merely "decline[d] to seek penalties against an individual for past conduct." Chaney, supra, 105 S.Ct. at 1665 (Marshall, J., concurring in the judgment). That is to say, INS's action here is even more akin to decisions traditionally made by prosecutors with absolute discretion. Id; see also Powell v. Katzenbach, 359 F.2d 234 (D.C.Cir.1965), cert. denied, 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 359 (1966). What is more, the agency action in Chaney involved substantive, statutory policy, whereas the agency action here involved internal personnel policy, explicitly exempted from judicial review under the APA. See 5 U.S.C. Secs. 553(a)(2), 554(a)(2) (1982); Stewart v. Smith, 673 F.2d 485, 496 (D.C.Cir.1982). Finally, by in effect prescribing the procedural format for INS to follow when granting immunity, the court runs afoul of "the established principle that administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.' " FCC v. Schreiber, 381 U.S. 279, 290, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383 (1965) (quoting FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 143, 60 S.Ct. 437, 441, 84 L.Ed. 656 (1940)), quoted in Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978).
 
 
 67
 Today's decision squares neither with law nor common sense. It ignores elementary truths about agencies, in which, like courts and every other form of institution ordained by mere mortals, not every matter of operational moment has been formalized and written up in some duly promulgated regulation or manual. Although I for one doubt it, some might be inclined to the quaint view that agencies, like courts, would be improved by reducing every nook and cranny of practice and procedure to writing and widely disseminating the resulting floodtide of materials to all its employees. But nothing in law or logic requires us to so order our own judicial house and nothing in law permits us to require agencies to conform to Utopian visions of a universe of sophisticated and formalized agency operations and procedures.
 
 
 
 [1]
 United States Immigration and Naturalization Serv., San Diego, Cal. and American Fed'n of Gov't Employees, Local 2544, 15 F.L.R.A. 383 (1984)
 
 
 [2]
 Neither party introduced this paper directly into evidence. Counsel for the INS told the ALJ that the contents of the paper were read into the record at the interview, and INS did introduce the transcript of the interview into evidence. The contents of the paper, therefore, can be gleaned only from that transcript
 
 
 [3]
 The highly charged atmosphere surrounding Reed's interview is dramatically portrayed in a brief excerpt from the transcript of the investigation:
 (Knocking sound in background)
 Unidentified voice in background: Do you want representation?
 Mr. Reed: If I can get it.
 Inv. Comey: He's, he's already declined representation, Mr. ...
 Unidentified voice in background: If he'd like representation, I'd like it put in the record you're declining it.
 Inv. Comey: He has declined it, would you please stop interrupting the statement? We're conducting an investigation here, and you are impeding the investigation.
 Unidentified voice in background: Greg, if you'd like representation, please so state so [sic].
 Mr. Reed: I would like representation, but I ...
 Inv. Comey: Well, you can't come in! You've agreed to proceed with the interview. Are you willing to continue?
 Mr. Reed: I'm willing, either way.
 Inv. Comey: O.K., let's continue. (Loud noises) You'd best not come in here, Mr. Foust! Call the Chief.
 Unidentified voice in background: He's demanding representation.
 Inv. Comey: He is not demanding, he said he's willing to continue either way, we told him ...
 Unidentified voice: He wants representation.
 Mr. Reed: I'm willing either way.
 Unidentified voice: Do you want representation at this time?
 Mr. Reed: If I can, yes.
 Inv. Comey: Well, you cannot, we told you that. Mr. Foust, I advise you not to open that door.
 Unidentified voice: He's requesting representation.
 Inv. Medici: He is not, Mr. Foust.
 Inv. Comey: He is not, he's already agreed to continue to testify. Call the Chief.
 Inv. Medici: What's the number for the Chief?
 Unidentified voice: Greg, do you want union representation?
 Mr. Reed: Yes, but I'm willing either way.
 Unidentified voice: You, do you request union representation?
 Mr. Reed: Yes.
 ...
 Inv. Comey: He's agreed to testify, you cannot come in.
 Unidentified voice: He is requesting union representation, you'd better open the d--- door or I'm kicking it down.
 Inv. Comey: You kick it down and you're going to be (noises in the background), you're jeopardizing yourself. Let's continue.
 J.A. at 222-24.
 
 
 [4]
 The relevant portion of the Kirby Memorandum states:
 Also attached for your information and guidance is a memorandum dated 5/21/79 concerning "Weingarten" rights. The memorandum is self-explanatory, however, I would like to mention a recent attempt to perhaps misuse its purpose.
 A witness in a recent investigation claimed that he feared possible disciplinary action should he testify, thus invoking "Weingarten," and entitling the witness to representation by the union. This fear was overcome by explaining to the witness, and made part of the record, that the investigator represented management in the matter and that as such any decision made was binding upon any action that management might consider against the witness. The witness was then advised that no disciplinary action would be considered or taken against him as the result of his testimony. This use of an administrative "use immunity" format effectively overcame the objections of the witness, thus removing the "Weingarten" entitlement and was, as stated, binding on management. Disciplinary action had not been a consideration otherwise the witness would have been a subject of investigation. The witness acknowledged this but was never the less adamant in expressing his fear of administrative sanctions.
 J.A. at 228 (emphasis supplied).
 The "memorandum dated 5/21/79," referred to in the Kirby Memorandum, was never introduced into evidence.
 
 
 [5]
 5 U.S.C. Secs. 7101-7135. Section 7116(a)(8) of the FLMR makes it an unfair labor practice for an agency to "fail or refuse to comply with any provision of this chapter." AFGE contends that the INS committed an unfair labor practice when it refused to comply with Sec. 7114(a)(2)(B) of the statute
 
 
 [6]
 Although Reed eventually agreed to submit to the interview without the presence of his union representative, the ALJ found that "such comments and answers by Reed did not vitiate his request for union representation at the interview." 15 F.L.R.A. 383, 389 n. 7
 
 
 [7]
 Section 7123(c) of the FLMR, 5 U.S.C. Sec. 7123(c), provides that appellate review of the FLRA's decisions shall be on the record in accordance with section 706 of the Administrative Procedures Act. Under that standard, this court must hold unlawful and set aside agency actions, findings or conclusions "unsupported by substantial evidence in a case ... reviewed on the record of an agency hearing provided by statute." 5 U.S.C. Sec. 706(2)(E)
 
 
 [8]
 The FLRA's opinion never clearly delineates the two prongs of its definition of "reasonably believes." Because the FLRA discusses both the effect on Reed of the words spoken by Medici and Comey and the actual validity of the immunity, it is clear that the FLRA considers each type of evidence to be relevant in this case under its construction of "reasonably believes." While the interpretation of the FLMR rests in the first instance with the FLRA, we see no need to remand this case for clarification of the standard. Under either construction of "reasonably believes," the FLRA's decision lacks substantial evidence in the record
 
 
 [9]
 Cf. Spartan Stores, Inc. v. NLRB, 628 F.2d 953 (6th Cir.1980) (reversing NLRB's conclusion that employee reasonably feared discipline where employee was familiar with the disciplinary procedures at the plant and was specifically told that he would not be disciplined)
 
 
 [10]
 Cf. Department of the Navy, Norfolk, 14 F.L.R.A. at 747 (employee entertained reasonable fear of disciplinary action where employee received advice not to attend meeting without a union representative and that advice came from a supervisor of the same managerial rank as the supervisor conducting the investigatory interview)
 
 
 [11]
 The record contains other evidence of possible misuse of the immunity. At the hearing before the ALJ, counsel for INS attempted to argue that the decision to immunize Reed was based on a desire to avoid the presence of Mr. Foust, the union representative, at the investigatory interview. See J.A. at 92-94
 
 
 [12]
 To apply the "reasonably inheres" prong otherwise would strip an employee of the protection of Sec. 7114(a)(2)(B) precisely when he most needs it, i.e., when the agency employer has convincingly lied or misstated the fact of immunity in order to dupe the employee into a false sense of security. We thus construe the FLRA's opinion to avoid an interpretation of Sec. 7114(a)(2)(B) so contrary to the plain dictates of reason and to congressional policy
 
 
 [13]
 Neither at oral argument nor in a requested supplemental memorandum to the court was counsel for the FLRA and the INS able to point to any additional evidence establishing a policy of granting administrative use immunity
 
 
 [1]
 See J.A. at 21 (The reports of misconduct were "in the papers for approximately a week or two weeks" and prompted an investigation by Senator Dennis DeConcini of Arizona.); 54 (There had been "news coverage on television, newspapers, [and] radio, as to the allegations" of misconduct by Border Patrol Agents.); 79 (The reports of misconduct were "receiving much media attention.")
 
 
 [2]
 See also IRS, L.A. District Office, 15 F.L.R.A. 626, 650-51 (1984); Department of the Navy, Norfolk Naval Base, Norfolk, Va., 14 F.L.R.A. 731, 745-46 (1984); Lackland Air Force Base Exchange, Lackland Air Force Base, Texas, 5 F.L.R.A. 473, 485 (1981); IRS, Washington, D.C. and NTEU, 4 F.L.R.A. 237 (1980), aff'd sub nom. IRS, Washington, D.C. v. FLRA, 671 F.2d 560, 563 (D.C.Cir.1982)
 
 
 [3]
 The FLRA relied on both IRS, Washington, D.C. v. FLRA, 671 F.2d 560, 563 (D.C.Cir.1982) (upholding FLRA finding that employee had reasonable fear of discipline where employee was not "assured that he would not be subject to discipline as the result of the interview.") and Spartan Stores, Inc. v. NLRB, 628 F.2d 953, 955 (6th Cir.1980) (holding that reasonable employee could not fear discipline from employer interview after receiving oral assurance from his supervisor that "nothing would happen to him as a result of the meeting")
 
 
 [4]
 The court concedes only that the FLRA decision is supported "by the fact that the OPR investigators told Reed that he was only a witness and not the subject of an investigation." At 726. Having assured itself that "this circumstance alone" did not provide substantial evidence for the FLRA's determination, the court "consequently" reversed. Id
 
 
 [5]
 J.A. at 72. The head of OPR reports to the Commissioner of the INS, id. at 254, and thus Mr. Dobbs was exactly two levels removed from the head of this large agency with worldwide operations
 
 
 [6]
 The court seeks to justify its lack of attention to Mr. Dobbs' inherent authority to grant immunity on the ground that he "certainly did not rely on any inherent power of the Commissioner." At 728. The record, however, reveals that Mr. Dobbs did rely on his inherent powers as a high-level representative of the Commissioner. J.A. at 86